1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   LEROME FRANKLIN,

11              Petitioner,                    No. 2:  11-cv-1691 JAM DAD P

12        vs.

13   R. H. TRIMBLE,

14              Respondent.           <u>ORDER AND</u>

15                                    <u>FINDINGS AND RECOMMENDATIONS</u>

16   _____/

17                          I.  INTRODUCTION

18              Petitioner is a state prisoner proceeding pro se with an application for a writ of

19   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner was convicted in 2008 in the Sacramento

20   County Superior Court of conspiracy to commit murder and attempted murder along with

21   enhancements that a principal discharged a firearm causing great bodily injury and that the crime

22   was perpetrated to benefit a criminal street gang.  Petitioner received a sentence of seventy-five

23   years to life imprisonment.  Petitioner raises three claims in this federal habeas petition;

24   specifically:  (1) insufficiency of the evidence to support the conviction of a conspiracy to

25   commit murder ("Claim I"); (2) the trial court should have given a jury instruction of felony

26   assault as a lesser included offense of attempted murder ("Claim II"); and (3) the trial court

1

violated petitioner's Confrontation Clause rights when it permitted Detective Quinn to testify as to the meaning of gang lingo ("Claim III").  For the following reasons, the petition seeking federal habeas relief should be denied.

## II.  FACTUAL BACKGROUND[1]

On the afternoon of March 15, 2007, the victim, Timothy Hurst (aka T-Money) and Taurus Baker (aka Stretch) were sitting in a van next to a park in South Sacramento waiting for their buyer to arrive to complete a drug deal.  Baker was a member of the Crips criminal street gang.  As they sat in the van, co-defendant Lerome Franklin (aka Rome) and Anthony Colbert (aka Ant) exited a tan Buick that pulled up alongside the van, and approached the van on foot.  Franklin and Colbert were members of the Del Paso Heights Bloods gang.  Crips and Bloods are enemies.  Franklin and Colbert told Hurst to get out of the van.  Franklin tried to get inside the van, but the sliding door was broken.  Colbert told Hurst, "This 'aint between you."  Hurst was not a member of a gang.  Franklin pulled out a gun.

Just as Franklin pulled out his gun, a police car drove up.  The officers observed a struggle going on in the front passenger seat. They identified Franklin as one of the men outside the van. Franklin was inside the passenger window of the van with his arms outstretched, struggling with the passenger of the van.  Colbert yelled, "the Police," and Franklin threw the gun in the van.  Colbert jumped back into the Buick, which then took off.  Franklin started running.  He was soon caught and arrested, and transported to the Sacramento County main jail.

While Franklin was in the holding tank at the main jail, he made a phone call to his "girl" who proceeded to make a series of three-way calls at his direction.  During one conversation he told someone to tell "YG" to "get on wa – uh, Money."  The person on the other end of the line said, "Who?"  Franklin responded, "Money.  You hear me?"  He asked, "You know who I'm talking about, right?"  The person indicated he knew who Franklin was talking about.

Finally, Franklin got through to YG, Young General, (aka defendant Martin).  The following conversation took place: "Franklin:  Yeah, ma, you gotta get on Money, bru. "YG:  Huh? "Franklin:  You gotta get on Money.

---

[1] The factual background is taken from the Court of Appeal of the State of California, Third Appellate District opinion dated November 30, 2010 and amended on December 22, 2010. (See Resp't's Answer Ex. A and Resp't's Lodged Doc. 6.)

"YG:  Money?

"Franklin:  Yeah.

"YG:  We – how much? . . .

"Franklin:  No nigger.  Not chalupa, nigger, Money.

"YG:  Oh – I'm trying to comprehend. . . .

"Franklin:  Arden and Del Paso, man, where your whip got snatched.

"YG:  Oh, okay.  Yeah, yeah, yeah, yeah.

"Franklin:  You know I'm talkin' bout?

"YG:  Yeah.

"Franklin:  You're my momma, nigger.

"YG:  He the fault?

"Franklin:  Yeah.

"YG:  Well, on TMG I'm about to go right now, nigger.

"Franklin:  You feel me, nigger?

"YG:  Yeah

"Franklin:  Nigger, MOB, my nigger.  Ma – man – man, that nigger, blue, you feel me, they gonna tell the police, nigger, nigger I tried to rob him.  You feel me?

"YG:  What?

"Franklin:  You feel me?

YG:  Little TMG (Unintelligible) nigger is – you are (Unintelligible) my momma, bro.  You already know, blood, I love ya, blu.  My momma, nigger, tooken care of, my nigger.  And nigger's –

"Franklin:  Yeah.

"YG:  – (Unintelligible) nigger.

"Franklin:  TMG, my nigger, man.  Man, that's some cold shit, though, bru.

"YG:  Well, my mother, blu, nigger.  You ain't gotta say nothing else, bro.

"Franklin:  Yeah, for real, for real. . . .

"YG:  [U]h, they – they said something – they – they found something or some shit.

"Franklin:  Yeah, they found the banger in them nigger's – in their whip. . . . you feel me, ma – ma – man, let that little ho-ass nigger know, though.  You feel me?"

After talking to Martin, Franklin told his "girl" to call Big Row (Rome).  [FN 1]  While talking to Franklin, Big Rome told him, "YG calling right now on another line."  Franklin told Big Rome to see what YG had to say.  After speaking with YG, Big Rome came back on the line to Franklin and said, "Yeah, he 'bout to – you know wha I mean – to go pop-pop-pop – on young boy."  Franklin responded, "Yeah man . . . ."  Big Rome continued, "And, uh, it's gravy and shit.  And, uh, you feel me? . . . Said – he said he gonna do that, like he – immediately right now. . . . And, um, yeah, them niggers got the guy and questioned him.  Uh, nigger, I don't know what them niggers thought they were getting down with. . . ."

[FN 1]  Franklin's nickname is Little Rome.  His

3

older brother Jerome Franklin's nickname is Big Rome.

A few hours after this call, at approximately 11:00 p.m. Hurst and Colbert were walking in the area of El Camino and Del Paso Boulevard, where they encountered several men at a motel, including Martin (YG).  One of the men said to Hurst, "So I heard you snitching."  Then the man challenged him to a fight, "before YG hit you with the heat."  At that moment, YG started shooting.  Hurst felt the first two shots in his face, but managed to run away.  He was eventually taken to the University at Davis Medical Center and treated.  The police questioned him while he was there, but he lied and said he did not know who had shot him.

Hurst suffered gunshot wounds to the chest, thigh, and hand.  He had a fractured scapula, fractured cervical vertebra, and several fractured ribs.  He suffered damage to his lungs, and a bullet lodged next to his neck.

At approximately 11:18 that night, another call was recorded from Franklin to an unidentified male.  During the conversation, the male said, "There's hella of 'em in the air, boy.  Hella flies flying around this motherfucker. . . . I don't know.  Man, there's hella flies flying around this motherfuckin' (Unintelligible).  It's over."  Franklin placed one more call to Martin at approximately 11:37 p.m.  Franklin told Martin, "I only got to say one (Unintelligible), I love you, nigger."  Franklin told Martin that he was his "savior, man."

Robert Quinn was a detective with the gang suppression unit of the Sacramento Police Department.  He was unaware of the above events when, in October 2007, he contacted Hurst in connection with a gang-related homicide.  He talked to Hurst to see if Hurst could identify some of the people in the gang.  Hurst was on probation at the time, and gave police his unwilling cooperation.  As Hurst looked through the pictures, he identified one of the photos as a picture of the person who shot him back in March.  Hurst did not want to tell Detective Quinn who the person was because he had been shot for snitching, and he did not want to snitch again.  Finally, Hurst stated that YG shot him, and pointed to a picture of defendant Martin.

Hurst was placed in the witness protection program and relocated from Sacramento.  He gave a statement regarding his shooting and testified at trial.

Hurst identified three other men who were present when he was shot:  Giovanni Figueroa (aka Tay), a person known as Country, and Steven Hendrix (aka Steve-O).  Hendrix was associated with the Trigger Mob street gang, a part of the Del Paso Heights Bloods.

4

Detective Quinn proceeded to question Hendrix, and took a statement from him, portions of which were played for the jury when Hendrix's trial testimony was not forthcoming.  In the recorded statement, Hendrix identified Martin as the person who shot Hurst, and identified him as a Trigger Mob member.

Detective Quinn conducted a videotaped interview with defendant Franklin.  During the interview, Franklin stated he had never heard of anyone called T-Money (Hurst), and that he had not talked to YG (Martin) since he had been in jail.  Quinn told Franklin that he had tapes of his telephone conversations in which he talked about T-Money and talked to YG (Martin).  Franklin refused to explain the conversations.

The trial court accepted Detective Quinn as the prosecution's gang expert.  He testified that the Bloods are the predominant Black gang in Sacramento.  There are numerous sets of Bloods in the Sacramento area, broken down by geographic area.  These sets are further broken down into subsets.  Thus, the Del Paso Heights Bloods further break down into Elm Street, True Heights Villains, Trigger Mob (TMG), Beast Mod, and Flat Dogs, to name a few.

TMG is part of Del Paso Heights Bloods.  Their primary activities are robbery, assault with a deadly weapon, murder, narcotics dealing, burglary and auto theft.  It has roughly 20 to 25 members. Defendant Franklin is a validated member of TMG, and admitted his association with the Del Paso Heights Bloods.  Martin is also a validated member of the Del Paso Heights Bloods, subset TMG.

Detective Quinn testified to his knowledge of gang slang.  He stated that "banger" and "clapper" are words used for gun.  "Whip" is slang for car.  "Chalupa" means cash."  "TMG" and "MOB" both refer to Trigger Mob.  "Flies flying around" means someone or something has died.

Detective Quinn testified the phrase "get on someone" could be used in multiple contexts.  It could mean to put pressure on someone, as to get on someone about getting a lawyer.  The phrase "get it on" would mean to party or use narcotics.  He was then asked what the phrase would mean under the hypothetical scenario where a "Del Paso Heights Blood member perceives one witness is snitching on him, and he in turn calls another Blood member and says, hey, get on this witness.  To which the other Blood member replies, is he the fault?  And the original caller responds, yeah. And then later on in the conversation says let that punk ass know, in that context.  What does 'get on' mean . . . ."  Detective Quinn replied that in that context it would mean to go shoot that person or kill them so that there would not be any witnesses.

The prosecutor then posted another hypothetical:  "Let's assume you have a Del Paso Heights Blood subset Trigga Mob member

1    who goes out in broad daylight with another Del Paso Heights
     Blood subset Trigger Mob member to shoot, kidnap, or rob a 29th
2    Street Crip.  [¶]  During the robbery, the police pull up.  As one of
     the Del Paso Heights Blood gang members is pulling his firearm,
3    he drops the firearm, runs from that robbery or assault scene, sees
     witnesses talking with police officers, is then booked into the
4    Sacramento County Jail, makes a phone call to another Del Paso
     Heights Bloods subset Trigga Mob member where he says – the
5    phrase is that I just described, get on this witness that he saw
     earlier during his arrest, to which the other person replies is he the
6    fault, and the original caller responds, yeah, and then shortly
     thereafter let that punk ass know, and then later on that night the
7    person who received the phone call, that validated Del Paso
     Heights Trigga Mob member, goes out and locates the witness, has
8    another person confront him about being a snitch, and then right
     after that, from point blank range, pulls out a revolver and fires off
9    several rounds at his head, and then after he falls and is [lying] on
     the ground is firing several rounds at his back and legs, critically
10   wounding the individual, do you have an opinion as to whether or
     not that crime would benefit the Del Paso Heights Bloods?”

11
     Detective Quinn responded that the crime would benefit the gang
12   for multiple reasons.  It would serve to keep the gang member out
     of jail, to let other people know that this is what happens if you talk
13   to the police, and would establish respect among the Del Paso
     Heights Bloods.
14

15   (Resp’t’s Answer Ex. A at p. 3-11.)

16                          III.  PROCEDURAL HISTORY

17          Petitioner appealed from his judgment of conviction to the California Court of

18   Appeal for the Third Appellate District.  (See Resp’t’s Lodged Doc. 2.)  The California Court of

19   Appeal affirmed the judgment of conviction.  (See Resp’t’s Answer Ex. A & Resp’t’s Lodged

20   Doc. 6.)  Petitioner’s petition for rehearing in the California Court of Appeal was subsequently

21   denied.  (See Resp’t’s Lodged Doc. No. 6.)  Petitioner then filed a petition for review in the

22   California Supreme Court which was summarily denied.  (See Resp’t’s Lodged Doc. No. 8.)

23          In June 2011, petitioner filed the instant federal habeas petition in this court.

24    Respondent filed an answer in September 2011 and petitioner filed his traverse that same month.

25   /////

26   /////

                                           6

IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can only be granted for violations of the Constitution or laws of the United States. See 28 U.S.C. § 2254(a); see also Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1994); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)). Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies.  See Lindh v. Murphy, 521 U.S. 320, 326 (1997).  Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the state court decision.  Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).  Nonetheless, "circuit court precedent may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably."  Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640 (2003).  Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may

7

grant the writ if the state court identifies the correct governing legal principle from the Supreme

Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[2]

Lockyer v. Andrade, 538 U.S. 63, 75 (2003); Williams, 529 U.S. at 413; Chia v. Cambra, 360

F.3d 997, 1002 (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ

simply because that court concludes in its independent judgment that the relevant state-court

decision applied clearly established federal law erroneously or incorrectly.  Rather, that

application must also be unreasonable."  Williams, 529 U.S. at 412.  See also Schriro v.

Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 (it is "not enough that a federal

habeas court, in its independent review of the legal question, is left with a 'firm conviction' that

the state court was 'erroneous.'").  "A state court's determination that a claim lacks merit

precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of

the state court's decision."  Harrington v. Richter, 562 U.S.___,___,131 S. Ct. 770, 786 (2011)

(quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  Accordingly, "[a]s a condition for

obtaining habeas corpus from a federal court, a state prisoner must show that the state court's

ruling on the claim being presented in federal court was so lacking in justification that there was

an error well understood and comprehended in existing law beyond any possibility for fairminded

disagreement."  Harrington,131 S. Ct. at 786-87.

        If the state court's decision does not meet the criteria set forth in § 2254(d), a

reviewing court must conduct a de novo review of a habeas petitioner's claims.  Delgadillo v.

Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th

Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because

of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

considering de novo the constitutional issues raised.").

---

[2]  Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding."  Stanley, 633 F.3d at 859 (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).

1   The court looks to the last reasoned state court decision as the basis for the state

2   court judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir.

3   2004).  If the last reasoned state court decision adopts or substantially incorporates the reasoning

4   from a previous state court decision, this court may consider both decisions to ascertain the

5   reasoning of the last decision.  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en

6   banc).  "When a federal claim has been presented to a state court and the state court has denied

7   relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

8   of any indication or state-law procedural principles to the contrary."  Harrington, 131 S. Ct. at

9   784-85.  This presumption may be overcome by a showing "there is reason to think some other

10  explanation for the state court's decision is more likely."  Id. at 785 (citing Ylst v. Nunnemaker,

11  501 U.S. 797, 803 (1991)).  Where the state court reaches a decision on the merits but provides

12  no reasoning to support its conclusion, a federal habeas court independently reviews the record to

13  determine whether habeas corpus relief is available under § 2254(d).  Stanley, 633 F.3d at 860;

14  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).   "Independent review of the record is

15  not de novo review of the constitutional issue, but rather, the only method by which we can

16  determine whether a silent state court decision is objectively unreasonable."  Himes, 336 F.3d at

17  853.  Where no reasoned decision is available, the habeas petitioner still has the burden of

18  "showing there was no reasonable basis for the state court to deny relief."  Harrington, 131 S. Ct.

19  at 784.

20  When it is clear, however, that a state court has not reached the merits of a

21  petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a

22  federal habeas court must review the claim de novo.  Stanley, 633 F.3d at 860; Reynoso v.

23  Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006).[3]

24

25      [3]  The United States Supreme Court has recently granted certiorari in a case apparently to
    consider this issue.  See Williams v. Cavazos, 646 F.3d 626, 639-41 (9th Cir. 2011), cert. granted
26  in part, ___U.S.___, 132 S. Ct. 1088 (2012).

9

# V.  ANALYSIS OF PETITIONER'S CLAIMS

A.  Claim I

In Claim I, petitioner asserts that there was insufficient evidence to convict him of conspiracy to commit murder.  The last reasoned decision addressing this claim was from the California Court of Appeal which analyzed the issue as follows:

> Defendants argue there was insufficient evidence to support the finding of an agreement to kill as required for a conviction or conspiracy to murder (count I).  We disagree.
>
> Evidence of the intent to kill element is usually derived from all the circumstances of the attempt, including the actions of the defendant.  (People v. Vu (2006) 143 Cal.App.4th 1009, 1025.) The evidence produced included more than the phone call between the defendants as interpreted by Detective Quinn.
>
> In addition to the telephone conversation, the jury could consider the circumstance that the victim of the shooting, Hurst, was the driver of a van whose passenger had been held up by Franklin.  It was that crime for which Franklin was in jail.  Franklin told Martin and others that Hurst and Stretch had tried to rob him, and were now trying to pin the crime on him.  Shortly after Franklin told Martin to "get on" Hurst, Franklin's older brother told him Martin was on the other line, and that he was about to "go pop-pop-pop on young boy."  [FN 3]  Franklin did not protest that this was not what he meant to happen.
>
> > [FN 3]  Martin's jury did not hear that Martin was the person on the other end of the call.
>
> That same night, someone told Hurst that the word on the street was that he was snitching.  Shortly thereafter, when Hurst encountered Martin and the others, one man said to Hurst, "So I heard you snitching."  The man challenged Hurst to a fight "before YG hit you with the heat."  Immediately afterward, Martin began shooting Hurst.  When Franklin was informed that Hurst was dead, he expressed no regret that his instructions had been misunderstood.  On the contrary, after being informed that Hurst had been killed, he told Martin he loved him and that Martin was his "savior."
>
> Based upon the totality of the circumstances, there was sufficient evidence for the jury to conclude that the defendants intended to murder Hurst.

(Resp't's Answer Ex. A at p. 15-16.)

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). There is sufficient evidence to support a conviction, if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). "[T]he dispositive question under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443 U.S. at 318). A petitioner for a federal writ of habeas corpus "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. V. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). In order to grant the writ, the habeas court must find that the decision of the state court reflected an unreasonable application of Jackson and Winship to the facts of the case. See id.

A federal habeas court determines sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law. See Jackson, 443 U.S. at 324 n.16; Chein, 373 F.3d at 983. To show that a person is guilty of conspiracy to commit murder under California law, the prosecution was required to show that: (1) petitioner and Martin entered into an agreement to unlawfully kill a human being; (2) each of specifically intended to enter into an agreement to kill a human being; (3) each of them harbored a specific intent to kill; and (4) one or both of them committed an overt act in furtherance of the agreement. See, e.g., People v. Cortez, 18 Cal. 4th 1223, 1229 (1998); People v. Swain, 12 Cal. 4th 593, 612-13 (1996).

When the evidence presented at trial in this case is viewed in the light most favorable to the prosecution, petitioner is not entitled to federal habeas relief based upon his argument that there was insufficient evidence to convict him of conspiracy to commit murder. The conversations between petitioner and Martin cited by the California Court of Appeal, along

11

1   with Detective Quinn's testimony of the phraseology established an agreement between

2   petitioner and Martin to kill Hurst.  There was specific intent to enter into this agreement as well

3   as both defendants harboring a specific intent to kill.  Furthermore, Martin committed the overt

4   act in furtherance of the agreement when he shot Hurst.

5          In his traverse, petitioner states that he is in possession of the "original cds" of the

6   telephone calls which gave rise to his conspiracy conviction.  (See Pet'r's Traverse at p. 4.)  He

7   states that the cds would show that the statements in the written transcripts are incorrect.  For

8   example, he argues that the statement "about to go pop pop pop on young boy" is actually "about

9   to ah da da pa pa, feel me boy" and that he did not say "you are my savior," but rather said "you

10  are my favorite."  Petitioner's assertions as to what is on these cds notwithstanding, the state

11  court record included the written transcript of these phone calls which contradicts petitioner's

12  assertions of what was said.  (See Clerk's Tr. at p. 527, 580.)  Relying on written transcripts of

13  the recordings did not result in a decision that was based on an unreasonable determination of the

14  facts, particularly in light of the fact that the evidence introduced at trial must be viewed in the

15  light most favorable to the prosecution.  Accordingly, petitioner is not entitled to federal habeas

16  relief on Claim I.

17        B.  Claim II

18          In Claim II, petitioner asserts that the trial court erred in denying his request for a

19  jury instruction on felony assault as a lesser included offense of attempted murder.  The last

20  reasoned decision on this issue was from the California Court of Appeal which analyzed the

21  claim as follows:

22          Franklin argues the trial court erroneously denied his request for an
            instruction on felony assault as a lesser included offense to count
23          two, attempted murder.  He argues that the jury was instructed it
            could find him guilty of attempted murder if it found he either
24          conspired with Martin to commit murder, or if he conspired with
            Martin to commit felony assault, and attempted murder was the
25          natural and probable consequence of the assault.  He argues that if
            the jury found he conspired with Martin to commit felony assault,
26          but did not believe that attempted murder was the natural and

1    probable consequence of the assault, he would be guilty only of
     felony assault, not attempted murder.  Therefore, he argues, the
2    jury should have been instructed in felony assault as a lesser
     included offense of attempted murder.

3

4    We conclude that even if such an instruction should have been
     given, a determination we do not make, it was harmless under the
5    circumstances of this case.

6    In a criminal trial the court must instruct on the general principles
     of law that are relevant to the issues raised by the evidence,
7    whether or not the parties request such instruction.  (People v. Cruz
     (2008) 44 Cal.4th 626, 664.)  This means the court is obligated to
8    instruct on lesser included offenses when the evidence raises a
     question as to whether all the elements of the charged offense are
9    present.  (Ibid.)  The trial court has no obligation to instruct on
     lesser included offenses when there is no evidence that the offense
10   committed was less than charged.  (Ibid.)

11   In a noncapital case we review any error to properly instruct the
     jury on a lesser included offense for prejudice under People v.
12   Watson (1956) 46 Cal.2d 818, 836.  Under this standard, the
     conviction may be reversed only if "'after an examination of the
13   entire cause, including the evidence' (Cal. Const., art. VI, § 13), it
     appears 'reasonably probable' the defendant would have obtained a
14   more favorable outcome had the error not occurred (Watson, supra,
     46 Cal.2d 818, 836)."  (People v. Breverman (1998) 19 Cal.4th
15   142, 178, fn. omitted.)

16   In this case there is no reasonable probability that Franklin would
     have obtained a more favorable outcome on count two had the jury
17   been instructed that felony assault was a lesser included offense to
     attempted murder, because the jury found beyond a reasonable
18   doubt in count one that Martin and Franklin were guilty of
     conspiracy to murder Hurst.  Thus, the conspiracy to murder would
19   have formed the basis for the attempted murder conviction whether
     or not the jury also found Franklin had conspired to feloniously
20   assault Hurst.  There is no reasonable probability that the jury
     would have found that attempted murder was not a natural and
21   probable consequence of conspiracy to commit murder.  Thus, if
     such an instruction was required in this case, its omission was
22   harmless error.

23   (Resp't's Answer Ex. A at p. 26-27.)

24        To receive federal habeas relief for an error in jury instructions, Petitioner must

25   show that the error so infected the entire trial that the resulting conviction violates due

26   process.  See Henderson v. Kibbe, 431 U.S. 145, 154 (1977).  "Due process requires that

1   criminal prosecutions 'comport with prevailing notions of fundamental fairness' and that

2   'criminal defendants be afforded a meaningful opportunity to present a complete defense.'" Clark

3   v. Brown, 450 F.3d 898, 904 (9th Cir. 2006) (quoting California v. Trombetta, 467 U.S. 479, 485

4   (1984)).   Failure to instruct on a defense theory of a case is only reversible error if the theory is

5   legally sound and the evidence in the case supports the instruction.  See Beardslee v. Woodfood,

6   358 F.3d 560, 577 (9th Cir. 2004).   Additionally, in order to obtain federal habeas relief on this

7   claim, Petitioner "must show that the alleged instructional error had substantial and injurious

8   effect or influence in determining the jury's verdict."  Byrd v. Lewis, 566 F.3d 855, 860 (9th Cir.

9   2009) (internal quotation marks and citations omitted), cert. denied, – U.S. –, 120 S.Ct. 2103,

10  176 L.Ed.2d 733 (2010).  "A substantial and injurious effect means a reasonable probability that

11  the jury would have arrived at a different verdict had the instruction been given."  Id. (internal

12  quotation marks and citation omitted).  In this case, the burden on petitioner is especially heavy

13  where the alleged error involves the failure to give an instruction.  See id.  An omission or an

14  incomplete instruction is less likely to be prejudicial than a misstatement of law.  See Henderson,

15  431 U.S. at 155; see also Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997).

16          In a non-capital case, such as this one, the "[f]ailure of a state court to instruct on

17  a lesser offense fails to present a federal constitutional question and will not be considered in a

18  federal habeas proceeding." Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984).  In Beck v.

19  Alabama, 447 U.S. 625, 638 (1980), the Supreme Court held that criminal defendants possess a

20  constitutional right to have the jury instructed on a lesser included offense in a capital case.

21  However, the Beck court expressly reserved the question of whether due process mandates the

22  application of the same right in non-capital cases.  See  447 U.S. at 638 n. 14.  The right to have

23  a jury instructed on a lesser included offense is not clearly established federal law in a non-

24  capital case and consequently, the failure of a state trial court to instruct on a lesser included

25  offense does not present a federal constitutional question.  See Windham v. Merkle, 163 F.3d

26  1092, 1106 (9th Cir. 1998).

1    In <u>Solis v. Garcia</u>, 219 F.3d 922, 929 (9th Cir. 2000), the Ninth Circuit stated that

2    there may be an exception to this general rule which would require adequate jury instructions on

3    a defendant's defense theory.  However, even if petitioner possessed this right, he still would not

4    be entitled to federal habeas relief with respect to his jury instruction error claim.  In this regard,

5    petitioner has failed to show that any purported instructional error would have had a substantial

6    and injurious effect on the jury's verdict in his case.

7    As stated by the California Court of Appeal, petitioner was convicted in Count I

8    of conspiracy to commit murder.  Accordingly, there is no reasonable probability that the jury

9    would have convicted him of felony assault as opposed to attempted murder on count two when

10   it had already convicted him of conspiracy to commit murder on count one.  Therefore, even if

11   petitioner was entitled to a felony assault instruction, failing to give that instruction did not have

12   a  substantial and injurious effect or influence in determining the jury's verdict.  Accordingly,

13   federal habeas relief with respect to petitioner's Claim II should be denied.

14   C.  Claim III

15   In Claim III, petitioner argues that his Confrontation Clause rights were violated

16   during Detective Quinn's testimony.  More specifically, petitioner asserts that the trial court

17   improperly allowed the detective to testify as to the meaning of the words used within the tape

18   recorded phone conversations.  (<u>See</u> Pet'r's Pet. at p. 16; <u>see also</u> <u>id.</u> at p. 11) ("The trial court

19   erroneously permitting Detective Quinn to testify as an expert on the meaning of the words used

20   during the third jail phone conversation, said testimony under the circumstances violated

21   petitioner's federal constitutional right to confrontation.")  The California Court of Appeal

22   analyzed the Confrontation Clause issue raised by petitioner as follows:

23   　　　Detective Quinn's expert testimony included a recitation of the
     　　　facts of the predicate offenses offered to establish a pattern of
24   　　　criminal gang activity for the purpose of proving the gang
     　　　enhancement.  (Pen. Code, § 186.22, subd. (b)(1).)  He derived this
25   　　　information from police reports and a discussion with the lead
     　　　investigator.  He testified that TMG was a subset of Del Paso
26   　　　Heights Bloods, and that one homicide and a number of assaults

had been committed by TMG members.  He obtained his information in part from conversations with gang members, victims and witnesses.

Detective Quinn's expert testimony also included his opinion that TMG was a subset of the Del Paso Heights Bloods and that Elm Street Bloods was another subset.

Citing Crawford v. Washington (2004) 541 U.S. 36 [158 L.Ed.2d 177] (Crawford), Martin argues Quinn's testimony violated his right of confrontation "to the extent it relied on and relayed testimonial hearsay" against him.  [FN]  Other California courts have rejected this argument when evaluating gang expert testimony.  (People v. Thomas (2005) 130 Cal.App.4th 1202 (Thomas); People v. Ramirez (2007) 153 Cal.App.4th 1422 (Ramirez).)

    [FN]  Defendant Franklin joins in this argument.

Thomas, supra, 130 Cal.App.4th at pages 1209-1210, held that a gang expert's conversations with other gang members were not admitted for the truth of their contents, but only as the basis for the expert's opinion.  As such, their use was not barred under Crawford, supra.

In Ramirez, supra, 153 Cal.App.4th 1422, the court held that testimony about the facts of predicate crimes did not violate the defendant's rights of confrontation because "[h]earsay in support of expert opinion is simply not the sort of testimonial hearsay the use of which Crawford condemned.  (Id. at p. 1427.)

Martin does not identify any particular statement that was improperly admitted, and has failed to demonstrate that the information upon which Detective Quinn relied was obtained from a custodial interrogation or was otherwise testimonial.  Instead, he points to the broad category of "statements of suspected gang members, victims, and witnesses to police," and argues that when an "officer questions an individual about his or someone else's gang membership" such conversation amounts to testimonial hearsay.

The types of statements upon which Detective Quinn relied do not appear to have been the types of statements protected by the Confrontation Clause.  There is no demonstration that they were "'formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions[,]'" or "'"solemn declarations or affirmation[s] made for the purpose of establishing or proving some fact."'"  Nor is there any demonstration that they were "'declaration[s] of facts written down and sworn to by the declarant before an officer authorized to administer oaths.'"  (Melendez-Diaz v. Massachusetts (2009) – U.S. –, [174

16

1   L.Ed. 2d 314, 321].)  Instead, they appear to be informal exchanges
    of information or instances of fact-gathering that were not
2   undertaken in contemplation of pursuing criminal charges against a
    particular person or persons.  As such, they were not testimonial.
3
    Following the reasoning in <u>Thomas</u>, <u>supra</u>, and <u>Ramirez</u>, <u>supra</u>, we
4   conclude Detective Quinn's reliance on these statements did not
    violate the defendant's confrontation clause rights.
5

6   (Resp't's Answer Ex. A at p. 17-19, Resp't's Lodged Doc. 6 at p. 2.)[4]

7           The Confrontation Clause of the Sixth Amendment specifically provides that "[i]n

8   all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the

9   witnesses against him."  U.S. CONST., amend VI.  The United States Supreme Court has held that

10  the Confrontation Clause bars the state from introducing out-of-court statements which are

11  testimonial in nature, unless "the declarant is unavailable, and only where the defendant has had

12  a prior opportunity to cross-examine."  <u>Crawford v. Washington</u>, 541 U.S. 36, 59 (2004).  The

13  Confrontation Clause does not, however, bar the use of testimonial statements for purposes other

14  than establishing the truth of the matter asserted.  <u>Crawford</u>, 541 U.S. at 59 n. 9.  "Thus,

15  <u>Crawford</u> does not undermine the established rule that experts can testify to their opinions on

16  relevant matters and, may relate the information and sources upon which they rely in forming

17  those opinions."  <u>Lopez v. Horel</u>, Civ. No. 07-4169, 2011 WL 940054, at *11 (C.D. Cal. Jan. 19,

18  2011) (citing <u>Ortiz v. Tilton</u>, Civ. No. 06-1752, 2008 WL 2543440, at *14, 16 (S.D. Cal. May 5,

19  2008), <u>report and recommendation adopted by</u>, 2009 WL 1796537 (S.D. Cal. Jun. 23, 2009)).

20  /////

21

22  [4] As the above recitation of the California Court of Appeal's decision illustrates, it did not
    specifically discuss the issue of whether petitioner's Confrontation Clause rights were violated in
23  the context of Detective Quinn's testimony regarding gang lingo definitions.  It appears as if
    petitioner raised this issue on appeal, but not in the context of the Confrontation Clause.  (<u>See</u>
24  Resp't's Lodged Doc. 2 at p. 55 ("The opinion that the Hurst shooting was committed as a result
    of words spoken during appellant's recorded jail calls was beyond the expertise of Detective
25  Quinn.  Whatever possible expertise would permit testimony of the meaning of those
    conversations, the detective did not possess it.").)  Nevertheless, even if <i>de novo</i> review is
26  applied in analyzing this issue, <u>see</u> <u>Chaker</u>, 428 F.3d at 1221, federal habeas relief would still be
    appropriately denied for the reasons discussed <u>infra</u>.

In rejecting petitioner's argument on the Confrontation Clause issue, the

California Court of Appeal specifically based its reasoning on the decisions in People v. Thomas,

130 Cal. App. 4th 1202 (2005) and People v. Ramirez, 153 Cal. App. 4th 1422 (2007).  (See

Resp't's Answer Ex. A at p. 19 ("Following the reasoning in Thomas, supra, and Ramirez, supra,

we conclude Detective Quinn's reliance on these statements did not violate the defendant's

confrontation clause rights.").)  In Thomas, the California Court of Appeal explained that:

> Crawford does not undermine the established rule that experts can
> testify to their opinions on relevant matters, and relate the
> information and sources upon which they rely in forming those
> opinions.  This is so because an expert is subject to cross-
> examination about his or her opinions and additionally, the
> materials on which the expert bases his or her opinion are not
> elicited for the truth of their contents; they are examined to assess
> the weight of the expert's opinion.  Crawford itself states that the
> Confrontation Clause "does not bar the use of testimonial
> statements for purposes other than establishing the truth of the
> matter asserted."  (Crawford, supra 541 U.S. at p. 59, fn. 9, 124
> S.Ct. at p. 1369, fn. 9, citing Tennessee v. Street (1985) 471 U.S.
> 409, 414, 105 S.Ct. 2078, 85 L.Ed.2d 425.)

Thomas, 130 Cal. App. 4th at 1210; see also Ramirez, 153 Cal. App. 4th at 1427 ("Hearsay in

support of expert opinion is simply not the sort of testimonial hearsay the use of which Crawford

condemned.").

Petitioner is not entitled to federal habeas relief on this claim.  As described

above, in Thomas the California court held that the admission of the expert's testimony did not

violate the Confrontation Clause because the testimony was not being offered for the truth of the

matter asserted.  Similar to the reasoning discussed in both Thomas and Ramirez:

> Numerous courts have held since Crawford that "the introduction
> of otherwise inadmissible evidence in support of a gang expert
> witness' testimony does not violate the Confrontation
> Clause."  [Lopez v. Horel, Civ. No. 07-4169, 2011 WL 940054, at
> *11 (C.D. Cal. Jan. 19, 2011), report and recommendation adopted
> by, 2011 WL 939023 (C.D. Cal. Mar. 8, 2011)]; see also Lopez v.
> Jacquez, Civ. No. 09-1451, 2010 WL 2650695, at *6 (E.D. Cal.
> July 1, 2010) ("[T]he Court does not find that an objective
> application of Crawford would result in a finding that the gang
> expert's reliance on hearsay testimony to explain his opinion that
> Petitioner was a member of the West Fresno Nortenos, and that the

West Fresno Nortenos area criminal street gang, to be in violation of Petitioner's Confrontation Clause rights), report and recommendation adopted by, 2010 WL 3384691 (E.D. Cal. Aug. 26, 2010); Walker v. Clark, Civ. No. 08-5587, 2010 WL 1643580, at *15 n. 8 (C.D. Cal. Feb. 18, 2010) ("Cason v. Hedgpeth, Civ. No. 08-4576, 2009 WL 1096209, at *13-14 (C.D. Cal. Apr. 22, 2009) (hearsay evidence regarding witness's gang membership did not violate Crawford because it was admitted not for the truth of the matter asserted but to support detective's opinion that witness was a gang member); Thomas v. Chromes, Civ. No. 06-787, 2008 WL 4597214, at *7 (C.D. Cal. Oct. 10, 2008) (gang expert's reliance on gang members' statements as basis for opinion that petitioner was a gang member did not violate Crawford); Ortiz [v. Tilton, Civ. No. 06-1752] 2008 WL 2543440, at *16 [(S.D. Cal. May 5, 2008)] (gang expert's reliance on field investigation reports, defendants' admissions as to gang member status, and other hearsay as basis for opinion did not violate Crawford because materials were not admitted for truth of the matter asserted and his reliance on them was subject to cross-examination); Nguyen v. Evans, Civ. No. 06-4630, 2008 WL 1994902, at *5 (N.D. Cal. May 5, 2008) (gang expert's testimony regarding information he received from other gang members and victims, which he used as a basis for his opinion, did not violate Crawford); Eddington v. Adams, Civ. No. 06-1770, 2008 WL 397290, at *10 (E.D. Cal. Feb. 8, 2008) (gang expert's reliance on gang member's statement as part of basis for opinion did not violate Crawford)."), report and recommendation adopted by, 2010 WL 1641372 (C.D. Cal. Ap. 20, 2010)

Her v. Jacquez, Civ. No. 09-612, 2011 WL 1466868, at *33 (E.D. Cal. Apr. 18, 2011).

Petitioner's issue with the admission of Detective Quinn's testimony is that his opinions on the definitions of gang lingo violated the Confrontation Clause.  However, petitioner was permitted to fully cross-examine Detective Quinn with respect to those opinions at trial.  As in the cases cited above, Quinn's testimony was not being offered for the truth of the matter asserted but was being offered as an opinion regarding the lingo.  Accordingly, petitioner's Confrontation Clause argument lacks merit and federal habeas relief with respect to his Claim III should be denied.

## VI.  REQUEST FOR AN EVIDENTIARY HEARING

Petitioner requests an evidentiary hearing on his Claims in his traverse.  A court presented with a request for an evidentiary hearing must first determine whether a factual basis exists in the record to support petitioner's claims, and if not, whether an evidentiary hearing

1  "might be appropriate." <u>Baja v. Ducharme</u>, 187 F.3d 1075, 1078 (9th Cir. 1999). <u>See also</u> <u>Earp</u>

2  <u>v. Ornoski</u>, 431 F.3d 1158, 1166 (9th Cir. 2005).  A petitioner requesting an evidentiary hearing

3  must also demonstrate that he has presented a "colorable claim for relief." <u>Earp</u>, 431 F.3d at

4  1167 (citations omitted).  To show that a claim is "colorable," a petitioner is "required to allege

5  specific facts which, if true, would entitle him to relief." <u>Ortiz v. Stewart</u>, 149 F.3d 923, 934 (9th

6  Cir. 1998) (internal quotation marks and citation omitted).  In this case, an evidentiary hearing is

7  not warranted for the reasons stated in above in the analysis of his claims for relief.  In short,

8  petitioner has failed to demonstrate that he has a "colorable" claim for federal habeas relief.[5]

9  Therefore, his request for an evidentiary hearing will be denied.

10  VII.  CONCLUSION

11  Accordingly, IT IS HEREBY ORDERED that Petitioner's request for an

12  evidentiary hearing is DENIED.

13  For all of the foregoing reasons, IT IS RECOMMENDED that the petition for writ

14  of habeas corpus be DENIED.

15  These findings and recommendations are submitted to the United States District

16  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

17  one days after being served with these findings and recommendations, any party may file written

18  objections with the court and serve a copy on all parties.  Such a document should be captioned

19  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

20  shall be served and filed within fourteen days after service of the objections.  The parties are

21  advised that failure to file objections within the specified time may waive the right to appeal the

22  District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).  In any objections he

23  elects to file, Petitioner may address whether a certificate of appealability should issue in the

24

25  [5]  Moreover, the Supreme Court has held that normally federal habeas review under 28 U.S.C. § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits" and "that evidence introduced in federal court has no bearing on" such

26  review. <u>Cullen v. Pinholster</u>, – U.S. –, 131 S.Ct. 1388, 1398, 1400 (2011).

1  event he elects to file an appeal from the judgment in this case.  <u>See</u> Rule 11, Federal Rules

2  Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability

3  when it enters a final order adverse to the applicant).

4  DATED: August 8, 2012.

5

6  _____

7  DALE A. DROZD
   UNITED STATES MAGISTRATE JUDGE

8  DAD:dpw
   fran1691.157

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26